# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA
450 Fifth Street NW
Washington, DC 20530

                    *Plaintiff*,

v.

GRAY TELEVISION, INC.
4370 Peachtree Road NE
Atlanta, Georgia 30319; and

QUINCY MEDIA, INC.
130 South 5th Street
Quincy, Illinois 62301

                    *Defendants*.

## COMPLAINT

The United States of America, acting under the direction of the Attorney General of the United States, brings this civil action against Gray Television, Inc. ("Gray") and Quincy Media, Inc. ("Quincy") to enjoin Gray's proposed acquisition of Quincy. The United States complains and alleges as follows:

## I.  NATURE OF THE ACTION

1.     Pursuant to a Stock Purchase Agreement dated January 31, 2021, Gray plans to acquire Quincy for approximately $925 million in cash.

2.     The proposed acquisition would combine popular local television stations that compete against each other in several markets, likely resulting in significant harm to competition.

3.      In seven Designated Market Areas ("DMAs"), Gray and Quincy each own at least one broadcast television station that is affiliated with one of the "Big Four" television networks: NBC, CBS, ABC, or FOX. These seven DMAs, collectively referred to in this Complaint as the "Overlap DMAs" are: (i) Tucson, Arizona; (ii) Madison, Wisconsin; (iii) Rockford, Illinois; (iv) Paducah, Kentucky – Cape Girardeau, Missouri – Harrisburg-Mt. Vernon, Illinois; (v) Cedar Rapids-Waterloo-Iowa City-Dubuque, Iowa; (vi) La Crosse-Eau Claire, Wisconsin; and (vii) Wausau-Rhinelander, Wisconsin.

4.      In each Overlap DMA, the proposed acquisition would eliminate competition between Gray and Quincy in the licensing of Big Four network content ("retransmission consent") to cable, satellite, fiber optic television, and over-the-top providers (referred to collectively as multichannel video programming distributors or "MVPDs"), for distribution to their subscribers. Additionally, in each Overlap DMA, the proposed acquisition would eliminate competition between Gray and Quincy in the sale of broadcast television spot advertising to advertisers interested in reaching viewers in the DMA.

5.      By eliminating a competitor, the acquisition would likely give Gray the power to charge MVPDs higher fees for its programming—fees that those companies would likely pass on, in large measure, to their subscribers. Additionally, the acquisition would likely allow Gray to charge local businesses and other advertisers higher prices to reach audiences in the Overlap DMAs.

6.      As a result, the proposed acquisition of Quincy by Gray likely would substantially lessen competition in the markets for retransmission consent in each of the Overlap DMAs, and in the markets for selling broadcast television spot advertising in each of the Overlap DMAs, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

## II.  THE DEFENDANTS

7.      Gray is a Georgia corporation with its headquarters in Atlanta, Georgia. Gray owns 165 television stations in 94 DMAs, of which 139 are Big Four affiliates. In 2020, Gray reported revenues of $2.4 billion.

8.      Quincy is an Illinois corporation with its headquarters in Quincy, Illinois. Quincy owns 20 television stations in 16 DMAs, of which 19 are Big Four affiliates. In 2020, Quincy had revenues of approximately $338 million.

## III.  JURISDICTION AND VENUE

9.      The United States brings this action under Section 15 of the Clayton Act, 15 U.S.C. § 25, as amended, to prevent and restrain Defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18.

10.     The Court has subject matter jurisdiction over this action pursuant to Section 15 of the Clayton Act, 15 U.S.C. § 25, and 28 U.S.C. §§ 1331, 1337(a), and 1345.

11.     Defendants sell broadcast television spot advertising to businesses (either directly or through advertising agencies) in the flow of interstate commerce, and such activities substantially affect interstate commerce.

12.     Gray and Quincy have each consented to venue and personal jurisdiction in this judicial district for purposes of this action. Both companies transact business in this district. Venue is proper in this district under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. § 1391(b) and (c).

## IV.  BIG FOUR TELEVISION RETRANSMISSION CONSENT MARKETS

### A.     Background

13.     MVPDs, such as Comcast, DirecTV, and Mediacom, typically pay the owner of each local Big Four broadcast station in a given DMA a per-subscriber fee for the right to retransmit the station's content to the MVPDs' subscribers. The per-subscriber fee and other terms under which an MVPD is permitted to distribute a station's content to its subscribers are set forth in a retransmission agreement. A retransmission agreement is negotiated directly between a broadcast station group, such as Gray or Quincy, and a given MVPD, and this agreement typically covers all of the station group's stations located in the MVPD's service area, or "footprint."

14.     Each broadcast station group typically renegotiates retransmission agreements with the MVPDs every few years. If an MVPD and a broadcast station group cannot agree on a retransmission consent fee at the expiration of a retransmission agreement, the result may be a "blackout" of the broadcast group's stations from the particular MVPD—i.e., an open-ended period during which the MVPD may not distribute those stations to its subscribers until a new contract is successfully negotiated.

### B.     Relevant Markets

#### 1.     Product Market

15.     Big Four broadcast content has special appeal to television viewers in comparison to the content that is available through other broadcast stations and cable networks. Big Four stations usually are the highest ranked in terms of audience share and ratings in each DMA, largely because of unique offerings such as local news, sports, and highly ranked primetime programs.

16.     Because of Big Four stations' popular national content and valued local coverage, MVPDs regard Big Four programming as highly desirable for inclusion in the packages they offer subscribers.

17.     Non-Big Four broadcast stations are typically not close substitutes for viewers of Big Four stations. Stations that are affiliates of networks other than the Big Four, such as the CW Network, MyNetworkTV, or Telemundo, typically feature niche programming without local news, weather or sports—or, in the case of Telemundo, only offer local news, weather, and sports aimed at a Spanish-speaking audience. Stations that are unaffiliated with any network are similarly unlikely to carry programming with broad popular appeal.

18.     If an MVPD suffers a blackout of a Big Four station in a given DMA, many of the MVPD's subscribers in that DMA are likely to turn to other Big Four stations in the DMA to watch similar content, such as sports, primetime shows, and local news and weather. This willingness of viewers to switch between competing Big Four broadcast stations limits an MVPD's expected losses in the case of a blackout, and thus limits a broadcaster's ability to extract higher fees from that MVPD—since an MVPD's willingness to pay higher retransmission consent fees for content rises or falls with the harm it would suffer if that content were lost.

19.     Due to the limited programming typically offered by non-Big Four stations, viewers are much less likely to switch to a non-Big Four station than to switch to other Big Four stations in the event of a blackout of a Big Four station. Accordingly, competition from non-Big Four stations does not typically impose a significant competitive constraint on the retransmission consent fees charged by the owners of Big Four stations.

20.     For the same reasons, subscribers—and therefore MVPDs—generally do not view cable network programming as a close substitute for Big Four network content. This is primarily

because cable networks offer different content. For example, cable networks generally do not offer local news, which provides a valuable connection to the local community that is important to viewers of Big Four stations.

21.     Because viewers do not regard non-Big Four broadcast stations or cable networks as close substitutes for the programming they receive from Big Four stations, these other sources of programming are not sufficient to discipline an increase in the fees charged for Big Four television retransmission consent.

22.     For all of these reasons, a hypothetical monopolist of Big Four television stations likely could impose a small but significant and non-transitory increase in the price ("SSNIP") it charges MVPDs for retransmission consent without losing sufficient sales to render the price increase unprofitable.

23.     The licensing of Big Four television retransmission consent therefore constitutes a relevant product market and line of commerce under Section 7 of the Clayton Act, 15 U.S.C. § 18.

### 2.      Geographic Markets

24.     A DMA is a geographic unit for which The Nielsen Company (US), LLC —a firm that surveys television viewers—furnishes broadcast television stations, MVPDs, cable networks, advertisers, and advertising agencies in a particular area with data to aid in evaluating audience size and composition. DMAs are widely accepted by industry participants as the standard geographic areas to use in evaluating television audience size and demographic composition. The Federal Communications Commission ("FCC") also uses DMAs as geographic units with respect to its MVPD regulations.

25.     In the event of a blackout of a Big Four network station, FCC rules generally prohibit an MVPD from importing the same network's content from another DMA. Thus, MVPD subscribers in one DMA cannot switch to Big Four programming in another DMA in the face of a blackout. Therefore, substitution to stations outside the DMA cannot discipline an increase in the fees charged for retransmission consent for broadcast stations in the DMA. Each DMA thus constitutes a relevant geographic market for the licensing of Big Four television retransmission consent within the meaning of Section 7 of the Clayton Act, 15 U.S.C. § 18.

### C.     Likely Anticompetitive Effects

26.     The more concentrated a market would be as a result of a proposed merger, the more likely it is that the proposed merger would substantially lessen competition. Concentration can be measured by the widely used Herfindahl-Hirschman Index ("HHI").[1] Under the *Horizontal Merger Guidelines* issued by the Department of Justice and the Federal Trade Commission, mergers that result in highly concentrated markets (i.e., with an HHI over 2,500) and that increase the HHI by more than 200 points are presumed likely to enhance market power and substantially lessen competition. *See, e.g., United States v. Anthem, Inc.*, 855 F.3d 345, 349 (D.C. Cir. 2017).

---

[1] The HHI is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers. For example, for a market consisting of four firms with shares of 30, 30, 20, and 20 percent, the HHI is 2,600 ($30^2 + 30^2 + 20^2 + 20^2 = 2,600$). The HHI takes into account the relative size distribution of the firms in a market. It approaches zero when a market is occupied by a large number of firms of relatively equal size, and reaches its maximum of 10,000 points when a market is controlled by a single firm. The HHI increases both as the number of firms in the market decreases and as the disparity in size between those firms increases.

27.     The chart below summarizes Defendants' approximate Big Four television retransmission consent market shares, based on revenue figures in BIA Advisory Services' *Investing in Television Market Report 2020* (1st edition), and the effect of the transaction on the HHI in each Overlap DMA.[2]

| Overlap DMA | Gray Share | Quincy Share | Merged Share | Pre-merger HHI | Post-merger HHI | HHI Increase |
|---|---|---|---|---|---|---|
| Tucson, AZ | 30% | 24% | 54% | 2,564 | 4,010 | 1,446 |
| Madison, WI | 30% | 23% | 53% | 2,556 | 3,956 | 1,400 |
| Paducah-Harrisburg, KY-IL | 30% | 23% | 53% | 2,622 | 4,022 | 1,400 |
| Cedar Rapids, IA | 26% | 20% | 46% | 2,533 | 3,600 | 1,067 |
| La Crosse-Eau Claire, WI | 33% | 20% | 53% | 2,622 | 3,956 | 1,333 |
| Rockford, IL | 27% | 20% | 47% | 2,533 | 3,600 | 1,066 |
| Wausau-Rhinelander, WI | 44% | 33% | 77% | 3,580 | 6,543 | 2,963 |

28.     As indicated by the preceding chart, the post-merger HHI in each Overlap DMA is well above 2,500, and the HHI increase in each Overlap DMA far exceeds the 200-point threshold. Thus, the proposed acquisition presumptively violates Section 7 of the Clayton Act in each Overlap DMA.

29.     The proposed transaction would give Gray the ability to black out more Big Four stations simultaneously in each of the Overlap DMAs than either Gray or Quincy could black out independently today. This would increase Gray's bargaining leverage with MVPDs, likely leading to increased retransmission consent fees charged to such MVPDs.

30.     Retransmission consent fees generally are passed through to an MVPD's subscribers in the form of higher subscription fees or as a line item on their bills.

---

[2] In this chart, sums that do not agree precisely reflect rounding.

## V.  BROADCAST TELEVISION SPOT ADVERTISING MARKETS

### A.    Background

31.    Broadcast television stations, including both Big Four and non-Big Four stations in the Overlap DMAs, sell advertising "spots" during breaks in their programming. Advertisers purchase spots from a broadcast station to communicate with viewers within the DMA in which the broadcast television station is located. Broadcast television spot advertising is distinguished from "network" advertising, which consists of advertising time slots sold on nationwide broadcast networks by those networks, and not by local broadcast television stations or their representatives.

32.    Gray and Quincy each own at least one Big Four affiliated television station in each of the Overlap DMAs and compete with one another to sell broadcast television spot advertising in each of the Overlap DMAs.

### B.    Relevant Markets

#### 1.    Product Market

33.    Broadcast television spot advertising constitutes a relevant product market and line of commerce under Section 7 of the Clayton Act, 15 U.S.C. § 18. Advertisers' inability or unwillingness to substitute to other types of advertising in response to a price increase in broadcast television spot advertising supports this relevant market definition.

##### i.    Overview of Broadcast Television Spot Advertising

34.    Typically, an advertiser purchases broadcast television advertising spots as one component of an advertising strategy that may also include cable television advertising spots, newspaper advertisements, billboards, radio spots, digital advertisements, email advertisements, and direct mail.

35.     Different components of an advertising strategy generally target different audiences and serve distinct purposes. Advertisers that advertise on broadcast television stations do so because the stations offer popular programming such as local news, sports, and primetime and syndicated shows that are especially attractive to a broad demographic base and a large audience of viewers. Other categories of advertising may offer different characteristics, but are not close substitutes for broadcast television spot advertising. For example, ads associated with online search results target individual consumers or respond to specific keyword searches, whereas broadcast television spot advertising reaches a broad audience throughout a DMA.

36.     Technological developments may bring various advertising categories into closer competition with each other. For example, broadcasters and cable networks are developing technology to make their spot advertising addressable, meaning that broadcasters could deliver targeted advertising in live broadcast and on-demand formats to smart televisions or streaming devices. For certain advertisers, these technological changes may make other categories of advertising closer substitutes for advertising on broadcast television in the future. However, at this time, for many broadcast television spot advertising advertisers, these projected developments are insufficient to mitigate the anticompetitive effects of the proposed acquisition in the Overlap DMAs.

ii.     **Cable Television Spot Advertising is Not a Reasonable Substitute**

37.     MVPDs sell spot advertising to be shown during breaks in cable network programming. For viewers, these advertisements are similar to broadcast television spot ads. However, cable television spot advertising is not at this time a reasonable substitute for broadcast television spot advertising for most advertisers.

38.    First, broadcast television spot advertising is a more efficient option than cable television spot advertising for many advertisers. Because broadcast television offers highly rated programming with broad appeal, each broadcast television advertising spot typically offers the opportunity to reach more viewers (more "ratings points") than a single spot on a cable network. By contrast, MVPDs offer dozens of cable networks with specialized programs that appeal to niche audiences. This fragmentation allows advertisers to target narrower demographic subsets by buying cable spots on particular channels, but it does not meet the needs of advertisers who want to reach a large percentage of a DMA's population.

39.    Second, households that have access to cable networks are divided among multiple MVPDs within a DMA. In contrast, broadcast television spot advertising reaches all households that subscribe to an MVPD and, through an over-the-air signal, most households with a television that do not.

40.    Finally, MVPDs' inventory of cable television spot advertising is limited—typically to two minutes per hour—contrasting sharply with broadcast stations' much larger number of advertising minutes per hour. The inventory of DMA-wide cable television spot advertising is substantially further reduced by the large portion of those spots allocated to local zone advertising, in which an MVPD sells spots by geographic zones within a DMA, allowing advertisers to target smaller geographic areas. Due to the limited inventories and lower ratings associated with cable television spot programming, cable television spot advertising does not offer a sufficient volume of ratings points, or broad enough household penetration, to provide a viable alternative to broadcast television spot advertising.

### iii.    Digital Advertising is Not a Reasonable Substitute

41.    Digital advertising is also not a sufficiently close substitute for broadcast television spot advertising. Some digital advertising, such as static and floating banner advertisements, static images, text advertisements, wallpaper advertisements, pop-up advertisements, flash advertisements, and paid search results, lacks the combination of sight, sound, and motion that makes television spot advertising particularly impactful and memorable and therefore effective for advertisers. Digital video advertisements, on the other hand, do allow for a combination of sight, sound, and motion, and on this basis are more comparable to broadcast television spot advertising than other types of digital advertising. However, they are still not close substitutes for broadcast television spot advertising because digital advertisements typically have a different scope of reach compared to broadcast television spot advertising. For example, while advertisers use broadcast television spots to reach a large percentage of households within a given DMA, advertisers use digital advertising to reach a variety of different audiences. While a small portion of advertisers purchase DMA-wide advertisements on digital platforms, digital advertisements usually are targeted either very broadly, such as nationwide or regional, or to a geographic target smaller than a DMA, such as a city or a zip code, or to narrow demographic subsets of a population.

### iv.    Other Forms of Advertising are Not Reasonable Substitutes

42.    Other forms of advertising, such as radio, newspaper, billboard, and direct-mail advertising, also do not constitute effective substitutes for broadcast television spot advertising. These forms of media do not reach as many local viewers or drive brand awareness to the same extent as broadcast television spot advertising does. Broadcast television spot advertising possesses a unique combination of attributes that advertisers value in a way that sets it apart from

advertising on other media. Broadcast television spot advertising combines sight, sound, and motion in a way that makes television advertisements particularly memorable and impactful.

43.    For all of these reasons, a hypothetical monopolist of broadcast television spot advertising likely could impose a SSNIP without losing sufficient sales to render the price increase unprofitable.

44.    The sale of broadcast television spot advertising therefore constitutes a relevant product market and line of commerce under Section 7 of the Clayton Act, 15 U.S.C. § 18.

## 2.    Geographic Markets

45.    For an advertiser seeking to reach potential customers in a given DMA, broadcast television stations located outside of the DMA do not provide effective access to the advertiser's target audience. The signals of broadcast television stations located outside of the DMA generally do not reach any significant portion of the target DMA through either over-the-air signal or MVPD distribution. Because advertisers cannot reach viewers inside a DMA by advertising on stations outside the DMA, a hypothetical monopolist of broadcast television spot advertising on stations in a given DMA could likely profitably impose at least a SSNIP.

46.    Each of the Overlap DMAs accordingly constitutes a relevant geographic market for the sale of broadcast television spot advertising within the meaning of Section 7 of the Clayton Act, 15 U.S.C. § 18.

## C.    Likely Anticompetitive Effects

47.    The chart below summarizes Defendants' approximate market shares, based on figures in BIA Advisory Services' *Investing in Television Market Report 2020* (1st edition), and the result of the transaction on the HHIs in the sale of broadcast television spot advertising in each of the Overlap DMAs.

| Overlap DMA | Gray Share | Quincy Share | Merged Share | Pre-merger HHI | Post-merger HHI | HHI Increase |
|---|---|---|---|---|---|---|
| Tucson, AZ | 27% | 25% | 52% | 2,059 | 3,389 | 1,330 |
| Madison, WI | 31% | 20% | 51% | 2,540 | 3,745 | 1,205 |
| Paducah-Harrisburg, KY-IL | 26% | 22% | 48% | 2,886 | 4,022 | 1,136 |
| Cedar Rapids, IA | 41% | 34% | 75% | 3,108 | 5,852 | 2,744 |
| La Crosse-Eau Claire, WI | 33% | 23% | 56% | 2,587 | 4,084 | 1,497 |
| Rockford, IL | 28% | 35% | 63% | 3,348 | 5,319 | 1,971 |
| Wausau-Rhinelander, WI | 40% | 38% | 78% | 3,479 | 6,489 | 3,010 |

48.     Defendants' large market shares reflect the fact that, in each Overlap DMA, Gray and Quincy each own one or more significant broadcast television stations. As indicated by the preceding chart, the post-merger HHI in each Overlap DMA is well above 2,500 and the HHI increase in each Overlap DMA far exceeds the 200-point threshold above which a transaction is presumed to enhance market power and harm competition. Defendants' proposed transaction is thus presumptively unlawful in each Overlap DMA.

49.     In addition to substantially increasing the concentration levels in each Overlap DMA, the proposed acquisition would combine Gray's and Quincy's broadcast television stations, which are generally close competitors in the sale of broadcast television spot advertising. In each Overlap DMA, Defendants' broadcast stations compete head-to-head in the sale of broadcast television spot advertising. Advertisers obtain lower prices as a result of this competition. In particular, advertisers in the Overlap DMAs can respond to an increase in one station's spot advertising prices by purchasing, or threatening to purchase, advertising spots on one or more stations owned by different broadcast station groups, thereby "buying around" the station that raises its prices. This practice allows the advertisers either to avoid the first station's price increase, or to pressure the first station to lower its prices.

50.     If Gray acquires Quincy's stations, advertisers seeking to reach audiences in the Overlap DMAs would have fewer competing broadcast television alternatives available to meet

their advertising needs, and would find it more difficult and costly to buy around higher prices imposed by the combined stations. This would likely result in increased advertising prices, lower quality local programming to which the spot advertising is attached (for example, less investment in local news), and less innovation in providing advertising solutions to advertisers.

51.     For these reasons, the proposed acquisition likely would substantially lessen competition in the sale of broadcast television spot advertising in each of the Overlap DMAs, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

## VI.  ABSENCE OF COUNTERVAILING FACTORS

52.     De novo entry into each Overlap DMA is unlikely. The FCC regulates entry through the issuance of broadcast television licenses, which are difficult to obtain because the availability of spectrum is limited and the regulatory process associated with obtaining a license is lengthy. Even if a new signal were to become available, commercial success would come over a period of many years, if at all. Because Big Four affiliated stations generally have the highest ratings in each DMA, they are more successful at selling broadcast television spot ads compared to non-Big Four affiliated broadcast stations. Thus, entry of a new broadcast station into an Overlap DMA would not be timely, likely, or sufficient to prevent or remedy the proposed acquisition's likely anticompetitive effects in the relevant markets.

53.     Defendants cannot demonstrate transaction-specific, verifiable efficiencies sufficient to offset the proposed acquisition's likely anticompetitive effects.

## VII.  VIOLATIONS ALLEGED

54.     The United States hereby incorporates the allegations of paragraphs 1 through 53 above as if set forth fully herein.

55.     Gray's proposed acquisition of Quincy likely would substantially lessen competition in the relevant markets, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. The acquisition would likely have the following anticompetitive effects, among others:

       a.      competition in the licensing of Big Four television retransmission consent in each of the Overlap DMAs likely would be substantially lessened;

       b.      competition between Gray and Quincy in the licensing of Big Four television retransmission consent in each of the Overlap DMAs would be eliminated;

       c.      the fees charged to MVPDs for the licensing of retransmission consent in each of the Overlap DMAs likely would increase;

       d.      competition in the sale of broadcast television spot advertising in each of the Overlap DMAs likely would be substantially lessened;

       e.      competition between Gray and Quincy in the sale of broadcast television spot advertising in each of the Overlap DMAs would be eliminated; and

       f.      prices for spot advertising on broadcast television stations in each of the Overlap DMAs likely would increase, the quality of local programming likely would decrease, and Defendants likely would be less innovative in providing advertising solutions to advertisers.

## VIII.  RELIEF REQUESTED

56.     The United States requests that:

       a.      the Court adjudge the proposed acquisition to violate Section 7 of the Clayton Act, 15 U.S.C. § 18;

       b.      the Court enjoin and restrain Defendants from carrying out the acquisition, or entering into any other agreement, understanding, or plan by which Gray would merge

with, acquire, or be acquired by Quincy, or Gray and Quincy would combine any of their respective Big Four stations in the Overlap DMAs;

      c.     the Court award the United States its costs of this action; and

      d.     the Court award such other relief to the United States as the Court may deem just and proper.

Dated: July 28, 2021
Respectfully submitted,

COUNSEL FOR PLAINTIFF UNITED STATES OF AMERICA


  /s/ Richard A. Powers                              /s/ Jared A. Hughes
RICHARD A. POWERS                          JARED A. HUGHES
Acting Assistant Attorney General            Assistant Chief
Antitrust Division                                 Media, Entertainment, & Communications Section
                                                      Antitrust Division


  /s/ Kathleen S. O'Neill                            /s/ Brendan Sepulveda
KATHLEEN S. O'NEILL                         BRENDAN SEPULVEDA* (D.C. Bar # 1025074)
Senior Director of Investigation and Litigation   Trial Attorney
Antitrust Division                                 United States Department of Justice
                                                      Antitrust Division
                                                      Media, Entertainment, & Communications Section
  /Scott Scheele                                   450 Fifth Street, NW, Suite 7000
SCOTT SCHEELE (D.C. Bar # 429061)        Washington, DC 20530
Chief                                              Telephone:  (202) 316-7258
Media, Entertainment, & Communications      Facsimile:  (202) 514-6381
Section                                           Email:  brendan.sepulveda@usdoj.gov
Antitrust Division

                                                      * LEAD ATTORNEY TO BE NOTICED